UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

MARCY DARNELL HUGHES )
)
V. ) NO. 2:12-CV-433
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 11 and 12].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be

upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 45 years of age, or a "younger" individual under the applicable regulations when her claims for Disability Insurance Benefits and Supplemental Security Income were administratively denied following a hearing before an Administrative Law Judge ["ALJ"]. She has a high school education and past relevant work experience Licenced Practical Nurse, work which she can undisputedly no longer perform.

Plaintiff's medical history is fairly summarized in the defendant's brief as follows:

> The earliest medical record in evidence is a 2006 brain MRI, which revealed, among other findings, no hemorrhage, ischemia, or mass effect; ventricles were mid-line and appropriate in size; gray white matter differentiation appeared normal; and bones, sinuses, and orbits appeared normal (Tr. 215). Also in the record is a February 2008 MRI of the cervical spine, which revealed degenerative changes at C3-4 and C6-7 levels; a minimal broad based bulge of disc margin with mild right side foraminal narrowing at the C3-4 level; a broad based bulge of disc osteophyte complex to mildly narrow the AP dimension at the C4-5 level; and a broad based disc osteophyte bulge with right sided foraminal narrowing at the C5-6 level (Tr. 213-214).
>
> Between December 2008 and July 2009, Plaintiff received medical treatment in four office visits with Medical Care, LLC (Tr. 280-300). At three of those office visits, Plaintiff received treatment from advanced practice nurses (APN) (Tr. 280-284, 290-291), who noted in the records examination results that were essentially unremarkable (Tr. 281, 284), except at the April 2009 visit, when APN Wendy Wilgus noted "tender thoracic spine and no muscle spasm" (Tr. 284). At that time, X-ray of the thoracic spine revealed no acute findings (Tr. 294): straightening of the normal kyphotic curve; minimal dextroscoliosis and slightly greater osteophytosis on the right at T6-T7; and, milder degenerative osteophytosis was noted at most other levels (Tr. 294). Anterior osteophytosis appeared prominent at the cervical levels at C4-C7 (Tr. 62, 294). Additional diagnostic testing on the same day revealed moderate scoliosis (Tr. 18, 293). At a July 2009 office visit, Dr. Arnold Hopland examined Plaintiff and noted decreased range of motion and muscle tenderness for Plaintiff's neck, lumbrosacral spine pain and left sciatica, but normal gait and balance with deep tendon reflexes (DTR) equal and symmetrical and sensation intact (Tr. 288). Dr. Hopland's assessment of Plaintiff included scoliosis, back pain, asthma

2

(unspecified, unchanged), diabetes, and hypertension (stable), among others (Tr. 288).

Dr. Wes Hanson began treating Plaintiff on August 7, 2009, when she complained of back pain, asthma and diabetes (Tr. 305, 304), but denied shortness of breath (Tr. 304). Dr. Hanson's examination records for this office visit note Plaintiff's blood pressure and "Neck: no Lymphadenopathy or thyroid enlargement. Heart regular. Lungs clear" (Tr. 304). Dr. Hanson's assessment was asthma, diabetes, and chronic back pain (Tr. 304). His plan was to increase pain medication (Ultram) to two times daily; he gave Plaintiff samples of Advair and noted that he would try to get her records (Tr. 304).

Plaintiff next saw Dr. Hanson in October 2009, when she complained of "asthma" and she had a dry cough (Tr. 304). Examination revealed temperature of 98.9 and "Lungs had some diffuse wheezing" (Tr. 303). Dr. Hanson's assessment was "asthma"; he gave Plaintiff a refill for Advair and a steroid injection (Tr. 303). In December 2009, Plaintiff received prescription refills and Dr. Hanson ordered a neck CT scan (Tr. 303). In January 2010, Plaintiff underwent CT scan of the thoracic and lumbar spine (Tr. 308), the report for which noted the following impressions: no evidence of compression fracture; moderate degenerative changes involving T11-12 and L3-4 levels; associated disc bulge at L3-4 (Tr. 18-19, 301).

Plaintiff next saw Dr. Hanson in March 2010, when she complained of "depression and diabetes" and asked to start on insulin (Tr. 302); in August 2010, Plaintiff complained of "diabetes and cough" and asked for and received an injection of Depo-Medrol (Tr. 376), which was given, and her diabetes medicine (Lantus) was increased (Tr. 376). Then, in April 2011, Plaintiff saw Dr. Hanson with complaints of "diabetes and asthma;" examination revealed "Lungs: clear" (Tr. 375).

Dr. Hanson, at Plaintiff's counsel's request, prepared a June 2011 opinion letter related to Plaintiff's abilities and limitations (Tr. 377-379). Dr. Hanson cited the results of the January 2010 CT scan report, noted Plaintiff's diabetes (partially controlled by medicine), asthma symptoms, allergies and obesity and opined that the combination of Plaintiff's impairments prevented her from consistently working a 40 hour work week; that she might be able to work an 8 hour day but "on many days out of a month (more than 2 days)" she would either be unable to complete an 8 hour day or even show up for work (Tr. 378). Dr. Hanson also set out in his opinion letter exertional, postural and environmental limitations (Tr. 378). For example, he opined that Plaintiff could stand or walk no more than 2 to 4 hours in an 8 hour day, sit no more than 2 to 4 hours in an eight hour day, and that she would need to change positions often (Tr. 378).

Dr. Krish Purswani saw Plaintiff for a physical consultative examination on June 2, 2010 (Tr. 327-331), when Plaintiff reported she gets out of breath after walking for about 60 minutes and that strong odors such as perfume trigger her shortness of breath (Tr. 327). She acknowledged no back surgery or injections, reported current low back pain with limitations and history of a 2006 trans ischemic attack (TIA) (Tr. 327). When questioned about residual effects from the TIA, Plaintiff attributed subsequent symptoms to neck pain and not to TIA (Tr. 328).

3

Plaintiff also reported bilateral knee pain, right foot pain and depression (Tr. 328). Dr. Purswani noted the results from Plaintiff's January 2010 CT scan of the thoracic and lumbar spine, which showed degenerative changes (Tr. 327, 308). Dr. Purswani's physical examination revealed Plaintiff's gait and station were normal; she used no assistive devices; she was able to get on and off the examination table without help and with normal effort; and she was able to follow instructions (Tr. 329). Plaintiff's neck was non-tender with normal range of motion (ROM) to flexion, extension and lateral flexion bilaterally (Tr. 329). Lungs were clear to auscultation (Tr. 329). Back examination was essentially unremarkable with no apparent scoliosis and was nontender (Tr. 330). Plaintiff had normal ROM in all extremities and strength was 5/5 in both upper and lower extremities (Tr. 330). Neurological exam was essentially normal; there were no tremors, Romberg was negative and toe and heel strengths were normal bilaterally (Tr. 330). Plaintiff was able to stand on each foot and tandem gait was normal (Tr. 330). Dr. Purswani opined that Plaintiff could frequently lift 40 pounds two-thirds of the time in an 8-hour day from the floor because of shortness of breath, back pain, neck pain, bilateral knee pain and right foot pain (Tr. 331). Dr. Purswani also opined that Plaintiff could sit for 8 hours in an 8-hour workday and she could stand and/or walk for seven hours a day, for a total of seven hours in an eight-hour workday (Tr. 331).

Plaintiff also alleged disability based on depression (Tr. 20). Therefore, Dr. Charlton Stanley, Ph.D., saw Plaintiff for a consultative psychological evaluation in June 2010 (Tr. 321-326). Plaintiff drove herself to the examination (Tr. 321). She reported that her activities of daily living include getting her son off to school, fixing meals for her husband, helping her son with his homework, playing video games and shopping in stores (Tr. 323). In the mental status evaluation, Plaintiff performed well on the serial 7's task; her short-term memory was intact; she demonstrated an average ability to think abstractly; and her overall thinking pattern appeared to be fairly well organized (Tr. 322). Plaintiff did not have difficulty maintaining a logical and coherent train of thought and she demonstrated an average degree of higher executive functioning (Tr. 322). Plaintiff reported situational anxiety characterized by worry, tension and sleep disturbances (Tr. 323). Plaintiff's overall cognitive ability appeared to be within the average range (Tr. 323). The examiner diagnosed an adjustment disorder with mixed anxiety and depressed mood and assessed that Plaintiff appeared fully capable of understanding simple information or directions with the ability to put it to full use in a vocational setting (Tr. 324).

The record contains several reports from state agency medical consultants who set out opinions based on a review of Plaintiff's records (Tr. 332-348, 350-362). Medical consultant M. Berkowitz completed a Psychiatric Review Technique (PRT) report in June 2010 and found Plaintiff had affective disorders (Tr. 332). M. Berkowitz also completed a mental RFC assessment (Tr. 346-348) and opined Plaintiff had moderate restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and, no episodes of decompensation of extended duration (Tr. 342). Medical consultant Dr. James N. Moore, M.D., completed a physical RFC

4

assessment in July 2010 (Tr. 350-358) and opined Plaintiff was able to occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about 6 hours in an 8 hour workday and sit about 6 hours in an 8 hour workday (Tr. 351).

The record evidence also includes records from LinCare, an oxygen provider service (Tr. 204, 217-279), which are not entirely clear but appear to include receipts for providing oxygen (Tr. 217-218); certificates of medical necessity (219-227); pulse oximetry monitoring reports (Tr. 230-236, 237-243, 269-279); insurance related information (Tr. 244); and, oximetry monitoring reports (Tr. 247-262, 264-267).

[Doc. 13, pgs. 2-7].

Plaintiff's testimony at the hearing before the ALJ is summarized in her brief as follows:

The Claimant stated she was 45 years of age at the time of the hearing, that she is a high school graduate and went to vocational technical school and became an LPN (Licensed Practical Nurse) in 1986. The Claimant testified that she was continuously employed as an LPN at all times in the last 15 years up until August of 2008, which is her alleged onset date, and in fact had worked as an LPN from 1992 through August, 2008. She testified that her job required her to be on her feet for 10-12 hours a day and lifting people who were 100 lbs to 250 lbs or more.

The Claimant stated that on January 3, 2008, she fell in an icy parking lot at a funeral home and has had neck pain since then. She rates her pain at 7 to 8 and it hurts in her lower lumbar spine, fingers and arms, through her chest and thoracic spine. She states that it's almost constant in her lumbar spine and affects her legs in which her right leg gives way and she falls without warning. The Claimant stated that the pain wakes her up 2-3 times a night. On an average night, she gets about 5-6 hours of sleep which is interrupted for a while when she takes pain medicine and medicine relaxers during the middle of the night.

The Claimant states that she has to take her time with her household chores and if the pain is not too bad, that she will wash dishes or maybe vacuum the living room, her son's bedroom, and sweep the kitchen. She says that she can work at doing chores for about an hour and a half to about two hours after which she has to rest about an hour before she can do any other chores. She states that she cannot do household chores at the same speed she could do them before having her back problems and she usually spends no more than a total of an hour to an hour and a half a day on household chores. Her husband does all of the outside chores. She testified that she occasionally goes out to the grocery store and the Dollar Store or to Wal-mart to pick up prescriptions, going maybe once a week to the grocery store and that she has trouble lifting things off of high shelves. The Claimant stated that she did not get out for social events at all, such as movies or ball games.

The Claimant stated that she has experienced breathing problems and was

5

Case 2:12-cv-00433-JRG-DHI   Document 14   Filed 08/27/13   Page 5 of 12   PageID #: 115

hospitalized with asthma in April of 2008, that she has to take a dose inhaler or nebulizer treatment 4 times a day plus asthma medication and takes two liters of oxygen at night.
  The Claimant stated that more than half of the days during a month she has bad days in which she can do no household chores.
  The Claimant testified that she had tendon release surgery to her right foot in 2000, but if she is on her foot a lot, it will have a sharp pain shoot through the top of it and it will give way, almost causing her to fall.
  Mrs. Hughes testified that she was 5 ft. 2 inches tall and weighed 261 lbs the last time that she saw Dr. Hanson. She testified that she has side effects from her medications that cause drowsiness.

[Doc. 11-1, pgs. 3-5].

At the hearing, the ALJ called Cathy Sanders, a Vocational Expert ["VE"]. He asked Ms. Sanders to assume a person of plaintiff's age, education and vocational experience. He asked her to assume that the plaintiff was restricted to light work, which is work requiring lifting up to 20 pounds occasionally and 10 pounds frequently. He asked the VE to assume the plaintiff was limited to "simple routine job tasks that would not expose her to excessive dust, fumes, chemicals, and temperature extremes." When asked if there were jobs such a person could perform, Ms. Sanders identified cashiers, with 6,000 jobs in the local economy and 1.2 million nationally; office assistant, with 3,000 jobs locally and 430,000 nationally; and telephone answering clerk, with 1,000 local jobs and 97,000 national jobs. (Tr. 45). When asked if any jobs would be available if the plaintiff were as limited as described in the letter of Dr. Hanson, Ms. Sanders testified that his restrictions would place the plaintiff "below sedentary and there are no jobs that I could find for her." (Tr. 45-46).

In his hearing decision, the ALJ found that the plaintiff had severe impairments of degenerative disc disease, asthma, diabetes, obesity and an adjustment disorder. (Tr. 15). He analyzed her medical history and treatment regarding a possible stroke and found, based

6

upon that evidence, that "a medically-determinable impairment has not been established." He found that her hypertension was well controlled with medication without evidence of end organ damage or vocational restrictions. Thus this impairment was not severe. Likewwise, he found that her foot pain and tendon-release surgery in 2001 posed only minimal vocational restrictions and was not severe. (Tr. 15-16).

The ALJ found that the plaintiff had the residual functional capacity ["RFC"] to perform light work that does not expose her to excessive dust, fumes, chemicals or temperature extremes, and that she was limited to simple, routine jog tasks. (Tr. 17).

He then discussed the plaintiff's medical history and the treatment she had received for her various conditions. He discussed the lack of any aggressive treatment by Dr. Hanson, her treating physician, for her degenerative disc disease, and gave plaintiff "the benefit of the doubt in limiting her to light work." This was said because both Dr. Purswani and the State Agency physician found that she could frequently lift 40 pounds with no environmental restrictions, which would constitute greater than light work, but slightly less than medium work, which require the occasional lifting of up to 50 pounds. (Tr. 19).

He discussed the plaintiff's severe impairment of diabetes, but noted that the medical records did not show kidney disease or end organ damage, and opined that it did not limit the plaintiff beyond his RFC finding. (Tr. 19).

He then discussed the opinions contained in Dr. Hanson's letter.[1] The ALJ found that

---

[1] The ALJ makes mention of the fact that Dr. Hanson wrote his letter "at the request of the claimant's attorney." Of course it was, and the fact that plaintiff's attorney asked her treating doctor for an evaluation in no way diminishes the evidentiary value of the contents of the letter. The contents will be judged solely on the legitimate grounds of consistency with the entire medical record, whether they are supported by Dr. Hanson's own records and treatment given,

7

"Dr. Hanson's opinion is too restrictive and is not supported by the totality of the medical evidence of record. Specifically, it is contrary to the opinions of the consultative examiner." The ALJ pointed out that, in his opinion, "the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were turly disabled, as the doctor has opined." (Tr. 19).

He noted the problems engendered by the plaintiff's obesity, stating "obesity may have an adverse impact upon co-existing impairments and limit an individuals's ability to sustain activity." He stated that he had considered the effects of her obesity in reaching his RFC conclusion. (Tr. 20).

He thoroughly discussed her depression, and, even though she had undertaken no mental health treatment, stated that this was why he limited her to simple, routine job tasks. (Tr. 20).

He then discussed the plaintiff's credibility, finding her not totally believable. He noted she had not required aggressive treatment or hospitalizations for pain, or pain management beyond some medications. He discussed her activities, finding they "do not support the claimant's self-limiting allegations." He found that her subjective complaints were only credible to the extent of his RFC finding. (Tr. 21).

He discussed the weight given to the various medical opinions and assessments. He gave significant weight to the opinions of Dr. Purswani and Dr. Stanley. He noted the opinions of the State Agency consultants, pointing out that his RFC finding was more restrictive than either that of Dr. Purswani or Dr. Moore. He then discussed the weight given

---

and the presence of other substantial evidence to the contrary.

8

Case 2:12-cv-00433-JRG-DHI   Document 14   Filed 08/27/13   Page 8 of 12   PageID #: 118

to Dr. Hanson's opinion. He gave the treating physician's letter, with what the ALJ characterized as "overly abundant limitations," no weight. He found these limitations "too restrictive and...not supported by the totality of the medical evidence of record." Particularly, he stated that "the course of treatment pursued by the doctor has not been consistent with abundant limitations as reported by the doctor." (Tr. 21).

He found, based upon the VE's testimony, that there were a significant number of jobs in the national economy that the plaintiff could perform. Accordingly, he found that she was not disabled. (Tr. 22-23).

Plaintiff raises two issues. First, she asserts that the ALJ failed to utilize the correct legal standard in evaluating Dr. Hanson's letter (Tr. 377-37). Second, he asserts that the decision of the ALJ to give great weight to Dr. Puswani, while giving no weight to the opinion of Dr. Hanson, was not "supported by substantial evidence."

With respect to the first assignment of error, that the ALJ did not utilize the correct standard in deciding what weight to give Dr. Hanson's letter, plaintiff states that the ALJ did not follow 20 C.F.R. § 416.927. This section discusses variuos areas to be considered in determining weight to be accorded to a physician's opinion. The first is the examining relationship, or whether the doctor actually examined the person, "generally" giving more weight to an examining physician or psychologist. Second, the treatment relationship should be considered, noting that "generally" more weight is given to treating sources for obvious reasons, such as the "detailed, longitudinal picture" they could give. There is an important caveat. The evidence from a treating source must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques..." and should not be "inconsistent

9

with other substantial evidence in..." the person's medical record.  If it is, it is to be given controlling weight.  If it isn't, it will be evaluated according to the other factors in this section, and the Commissioner "will always give good reasons in our notice of determination or decision for the weight..." given to a treating sources opinion.  The section then states that the length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship will be considered.

The third factor is the "relevant evidence" presented by the medical source to support an opinion.  The fourth is the consistency of the report with the record as a whole.  Finally, more weight is "generally" given to the opinion of a specialist.

Plaintiff complains that the ALJ's opinion "does not appear" to include "a consideration of this standard, in that the ALJ does not engage in an analysis.

To the contrary, the ALJ thoroughly discussed and contrasted of the reports of Dr. Hanson with that of Dr. Purswani.  He noted the lack of any aggressive treatment.  Dr. Hanson did not prescribe so much as a steroid shot or physical therapy.  After the January 2010 CT scan, plaintiff saw Dr. Hanson in March and August of 2010 and April of 2011.  The complaints voiced by plaintiff at these sessions, and the treatments prescribed, certainly do not support the near-invalid status opined in Dr. Hanson's letter.

In the opinion of the Court, the ALJ obviously considered all of the aspects of Section 916.927.

The second assignment of error, that there was not "substantial evidence" to support giving more weight to Dr. Hanson than Dr. Purswani, is similar.  She asserts that Dr. Purswani did not view or consider any medical records.  In point of fact, Dr. Purswani

10

mentioned and quoted from the January 2010 CT scan. There is virtually nothing in Dr. Hanson's records of which Dr. Purswani was not aware, and after giving an objective physical examination, Dr. Purswani opined on the plaintiff's functional capacity. The problem here is that Dr. Hanson's notes and treatments support Dr. Purswani's findings much more than they do those contained in Dr. Hanson's letter.

There are, as plaintiff asserts, various cases dealing with the level of deference due in Social Security cases to treating physicians. Indeed, this Court has remanded several cases over the years where an ALJ would stretch the limits too far. The present case is factually distinguishable from the cases cited by the plaintiff.

In this case, the ALJ did not cut corners, he did not play doctor, and he had substantial evidence to support his determinations. He examined the evidence and gave it appropriate weight in his role as finder of fact. There are valid reasons given for the weight accorded to Dr. Puswani, and for no weight being given to Dr. Hanson's letter. Accordingly, there was substantial evidence to support the RFC finding and the question addressed to the VE. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 11] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 12] be GRANTED.[2]

                                        Respectfully submitted,

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

   s/ Dennis H. Inman
United States Magistrate Judge